LOUIS K. LIGGETT COMPANY, a Corporation, WINN & LOVETT GROCERY COMPANY, a Corporation, and PAXSON'S INC., a Corporation, *Appellants*, vs. ERNEST AMOS, as Comptroller of the State of Florida, R. B. COUNCIL, as Tax Collector of Leon County, Florida, and R. F. BOWDEN, as Tax Collector of Duval County, Florida, *Appellees*.

141 So. 153.

En Banc.

Opinion filed April 4, 1932.

Petition for rehearing denied May 19, 1932.

*Kay, Adams, Ragland & Kurz,* for Appellants;

*Cary D. Landis,* Attorney General, and *H. E. Carter,* Assistant, for Appellees.

TERRELL, J.—The Legislature of 1931 in Extraordinary Session enacted Chapter 15624, Laws of Florida, imposing licenses and fees for opening, operating, maintaining, or establishing stores in this State and to define the duties of the Comptroller and Tax Collectors of the several counties with reference thereto.

This suit was brought by appellants pursuant to Section

Fourteen of the 1931 Chancery Act (Chapter 14658, Acts of 1931) to test the validity of Chapter 15624 generally referred to as the Chain Store Act. The chancellor below held the act valid as against the attack made on it and granted the defendant's motion to dismiss the bill of complaint at the cost of the complainants. Appeal was taken from that decree.

It is first contended that Chapter 15624 was enacted in violation of Section Eight of Article Four of the Constitution of Florida in that certain amendments thereto adopted in the Senate June 24, 1931, and in the House of Representatives June 19, 1931, constituted "legislative business" and were not adopted by a two-thirds vote, neither was the subject matter of said Act embraced within the Governor's proclamation of June 6, 1931, calling the Legislature in Extraordinary Session.

Section Eight of Article Four of the Constitution provides for calling the Legislature in Extraordinary Session and limits legislative business transacted at such sessions to that stated in the proclamation of the Governor calling the session or that called to the attention of the Legislature while in session or that initiated while in session by a vote of two-thirds of each house. We think the subject matter of Chapter 15624 was fully comprehended in the proclamation of the Governor calling the Legislature in Extraordinary Session but if it was not so comprehended the record discloses that both the House of Representatives and the Senate agreed by a two-thirds vote to receive and consider committee substitute for House Bill 8-X which was finally adopted and became Chapter 15624. The two-thirds vote required by Section Eight of Article Four applies only to the matter of taking up "legislative business" for consideration not embraced in the Governor's proclamation or called by him to their attention while in session. After agreeing by two-thirds vote to consider any "legislative business" it then takes the regular course under the

rules and may be amended, adopted, or rejected by a majority vote. For all the record shows Chapter 15624 was adopted by a two-thirds vote.

It is next contended that Section Five of Chapter 15624 creates arbitrary and unreasonable discriminations between chain or multiple store retail merchants and single store retail merchants engaged in the same class of business contrary to the equal protection and the due process clauses of the Federal Constitution and Sections One, Four, and Twelve of the Declaration of Rights, Constitution of Florida. This is the dominant question presented and the answer to it is decisive of the case.

Section Five, Chapter 15624 is as follows:

"Section 5. Every person, firm, corporation, association or co-partnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this State, under the same general management, supervision or ownership, shall pay the license fee hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fee prescribed in Sections 2 and 4 of this Act.

" 'The license fees herein prescribed shall be as follows:

" ' (1) Upon one store, the annual license fee shall be Five Dollars for each such store.

" ' (2) Upon two stores or more, but not exceeding fifteen stores, where the same are located in any one county, the annual license fee shall be Ten Dollars for each such additional store.

" ' (3) Upon two stores or more, but not to exceed fifteen stores, where the same are located in different counties, the annual license fee shall be Fifteen Dollars for each such additional store.

" ' (4) Upon each store in excess of fifteen, but not to exceed thirty, when all are located in any one county, the annual license fee shall be Fifteen Dollars for each such additional store.

" ' (5) Upon each store in excess of fifteen, but not to exceed thirty, where the same are located in different counties, the annual license fee shall be Twenty Dollars for each such additional store.

" ' (6) Upon each store in excess of thirty, but not to exceed fifty, where all are located in any one county, the annual license fee shall be Twenty Dollars for each such additional store.

" ' (7) Upon each store in excess of thirty, but not to exceed fifty, where the same are located in different counties, the annual license fee shall be Thirty Dollars for each such additional store.

" ' (8) Upon each store in excess of fifty, but not to exceed seventy-five stores, where all are located in any one county, the annual license fee shall be Thirty Dollars for each such additional store.

" ' (9) Upon each store in excess of fifty, but not to exceed seventy-five, where the same are located in different counties, the annual license fee shall be Forty Dollars for each such additional store.

" ' (10) Upon each store in excess of seventy-five, where all are located in any one county, the annual license fee shall be Forty Dollars for each such additional store.

" ' (11) Upon each store in excess of seventy-five, where the same are located in different counties, the annual license fee shall be Fifty Dollars for each such additional store.

" 'In addition to the above amounts, Three Dollars for each and every One Thousand Dollars of value of stock carried in each store for sale in such store.' "

As a prelude to the exegesis which follows we may say that remarkably few cases have made their appearance in this Court so thoroughly prepared and presented. Counsel for Appellants have supported their cause by many publications from the pens of some of the outstanding specialists in this country. These publications are devoted exclusively to the origin, history, economic, and social development of the chain store business and while they do not treat the legal aspect of the case with which we are here confronted

they throw much light on it. We had conceived the chain store as a product of our industrial era but by a well established chronology its roots sink much deeper in our history, so deep in fact that it is coeval with the discovery of America, and it may be entirely possible that Columbus provisioned the Pinta, the Nina, and the Santa Maria from a chain store when he set out on his famous voyage in 1492.

This Court has repeatedly held that to construe or test the validity of a legislative enactment, resort may be made to the history of the legislation, the contemporary conditions, political, industrial, and social of the community at whose suggestion the statute was promulgated and that it may be compared with cognate laws to determine its meaning and effect. Lee vs. Clearwater Growers Association, 93 Fla. 214, 111 So. 722; Amos vs. Matthews, 99 Fla. 1, 126 So. 308; Jerome H. Sheip Co. vs. Amos, 100 Fla. 863, 130 So. 699; Gray vs. Central Florida Lumber Co., decided by this Court March 15, 1932.

The term "due process of law," or "law of the land," as written in Magna Carta, was engrafted on the Federal and State Constitutions from the Petition of Right where it appears to have been first used, though it has the same meaning regardless of the form in which used. As applied to life, liberty, or property, due process of law is a fundamental, personal, Constitutional guaranty and as against the United States it is provided by the Fifth and Fourteenth Amendments. As against the States, it is provided by the Fourteenth Amendment and as against the State of Florida, it is provided by Sections Four and Twelve of the Declaration of Rights. The language of the Fifth and Fourteenth Amendments as to due process is identical yet they were engrafted on the Constitution under very different circumstances. We do not discuss these circumstances here except to say that while the Fifth Amendment as a re-

straint on the Federal government preceded the Fourteenth by most one hundred years, it was rarely invoked while as soon as the restraint against the states was provided in the Fourteenth Amendment, the dockets of the courts were crowded with cases affecting it. Courts have generally proceeded on the assumption that the legal import of the phrase was the same in both Amendments yet it is admitted that circumstances might arise in which a different construction and application of their provisions would be proper. French vs. Barber Asphalt Paving Co., 181 U. S. 324, 328, 21 Sup. Ct. Rep. 625, 45 L. Ed. 879. See also Slaughter House Cases, 16 Wall. (U. S.) 36, 21 L. Ed. 394.

The Supreme Court of the United States has consistently declined to attempt a precise definition of ''due process of law,'' Davidson vs. New Orleans, 96 U. S. 97, 101, 24 L. Ed. 616, but has frequently commended this Constitutional guaranty, Holden vs. Hardy 169 U. S. 366, 389, 18 Sup. Ct. Rep. 383, 42 L. Ed. 780, Yick Wo vs. Hopkins, 118 U. S. 356, 6 Sup. Ct. Rep. 1064, 30 L. Ed. 220; Bank of Columbia vs. Okley 4 Wheat. (U. S.) 235, 244, 4 L. Ed. 559. Its meaning is discussed generally in Kennard vs. Louisiana, 92 U. S. 480, 23 L. Ed. 478; Davidson vs. New Orleans 96 U. S. 97, 24 L. Ed. 616; *Ex Parte* Wall 107 U. S. 265, 2 Sup. Ct. Rep. 569, 27 L. Ed. 552; Hagar vs. Reclamation Dist. No. 108, 111 U. S. 701, 4 Sup. Ct. Rep. 663, 28 L. Ed. 569; Missouri Pac. Ry. Co. vs. Humes 115 U. S. 512, 6 Sup. Ct. Rep. 110, 29 L. Ed. 463; Freeland vs. Williams 131 U. S. 405, 9 Sup. Ct. Rep. 763, 33 L. Ed. 193; Hallinger vs. Davis 146 U. S. 314, 13 Sup. Ct. Rep. 105, 36 L. Ed. 986.

As applied to crimes, life or liberty being involved; ''due process of law'' requires that all persons so charged be tried in a court of justice according to the rules and regulations provided by law for its orderly administration. When orderly administration is supplanted by arbitrary,

unreasonable or unwarranted exercise of governmental power "due process of law" is denied. As applied to property, "due process of law" presents a more complex question. For this reason on pain of failure to be sufficiently comprehensive and perspicuous, state and federal courts have generally determined the application of the principle by judicial inclusion and exclusion as the case arises and have made no attempt at a comprehensive definition to fit every case. Due process of law is in its final analysis a judicial question and whenever invoked requires opportunity for hearing and defense in proceedings appropriate to the case and just to the parties affected. It must be pursued in an orderly manner in proceedings adapted to the end to be attained. It implies conformity with the natural and inherent principles of justice for the protection of individual rights, forbids the taking of one's property without compensation and requires that no one be condemned in person or property without opportunity to be heard. Holden vs. Hardy 169 U. S. 366, 18 Sup. Ct. Rep. 383, 42 L. Ed. 780. As applied in the Dartmouth College Case (4 Wheat. (U. S.) 518, 4 L. Ed. 629) Mr. Webster defined it as the law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning of all this is that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society in our democracy.

The "equal protection of the laws," like "due process of law," as applied to life, liberty, and property is likewise a fundamental, personal, Constitutional guaranty, and as against the States and the United States is provided by the Fourteenth Amendment. As against the State of Florida, it is secured by Sections One and Four of the Declaration of Rights. Both rights are ultimately of judicial determination and are frequently treated together.

The equal protection clause, like the due process clause,

is generally not susceptible of exact delimitation. It is also said by some courts that no definite rule in respect of either, which will automatically solve the question in specific instances, can be formulated. Certain general principles, however, have been established, in the light of which the cases as they arise are to be considered and determined. It has been said generally that "equal protection of the law" means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes of persons in the same place and in like circumstances. Connolly vs. Union Sewer Pipe Co., 184 U. S. 540, 558, 22 Sup. Ct. Rep. 431, 46 L. Ed. 679; Bowman vs. Lewis 101 U. S. 22, 25 L. Ed. 989; Kentucky Railroad Tax Cases 115 U. S. 321, 6 Sup. Ct. Rep. 57, 29 L. Ed. 414; Magoun vs. Illinois Trust and Savings Bank, 170 U. S. 283, 293; 18 Sup. Ct. Rep. 594, 42 L. Ed. 1037.

Prior to the adoption of the Fourteenth Amendment, the law of the states in terms insured equal protection to all persons. The Fourteenth Amendment conferred no new or additional right but merely extended the protection of the Federal Constitution over the right to life, liberty, and property that previously existed under all State Constitutions. The right so extended is secured to all persons whether citizens or not and that which constitutes denial of equal protection will depend largely on what protection has been extended or what rights have been conferred under the Constitution and laws of the particular state in which the question arises. The rule that each case must rest on its own facts is particularly applicable to this class of cases. Nashville C. & St. L. Ry. vs. Taylor 86 Fed. 168, text 185.

The prohibition against the denial of equal protection "was not intended to compel the state to adopt an iron rule of equal taxation" nor "to prevent a state from adjusting its system of taxation in all proper and reasonable

ways." Bell's Gap R. Co. vs. Pennsylvania 134 U. S. 232, 10 Sup. Ct. Rep. 533, 33 L. Ed. 893, 892. Neither does it prevent the states from distinguishing, selecting, and classifying objects of legislation within a wide range of discretion, provided only that the discretion must be based on some reasonable ground. If the statute or classification is applicable to all persons under like circumstances and subjects no one to arbitrary exercise of power or if it operates alike on all persons similarly situated, it is sufficient. Tinsley vs. Anderson 171 U. S. 101, 18 Supt. Ct. Rep. 805, 43 L. Ed. 91; Walston vs. Nevin 128 U. S. 578, 9 Sup. Ct. Rep. 192, 32 L. Ed. 544. The classification may be limited as to objects or territory if all persons subject to it are treated alike under like circumstances and conditions. Hayes vs. Missouri 120 U. S. 68, 7 Sup. Ct. Rep. 350, 30 L. Ed. 578; Giles v. Teasley 193 U. S. 146, 24 Sup. Ct. Rep. 359, 48 L. Ed. 655; Toyota vs. Territory of Hawaii 226 U. S. 184, 33 Sup. Ct. Rep. 47, 57 L. Ed. 180.

"Classification must have relation to the purpose of the legislature, but logical appropriateness of the inclusion or exclusion of objects or persons is not required. A classification may not be merely arbitrary, but necessarily there must be great freedom of discretion even though it result in ill advised, unequal, and oppressive legislation;" Heath & Milligan Mfg. Co. vs. Worst, 207 U. S. 338, 28 Sup. Ct. Rep. 114, 52 L. Ed. 236; Mobile County vs. Kimball 102 U. S. 691, 26 L. Ed. 238.

The Supreme Court of Pennsylvania has held that whether a classification under a statute is a denial of equal protection of the laws is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrational ones used for the purpose of evading the Constitutional prohibition. If the distinctions are genuine, the courts cannot declare them void, though they may not consider them made on a sound basis. The

test is not wisdom but good faith in the classification. Seabolt vs. Commissioners of Northumberland Company 187 Pa. St. 318, 41 Atl. 22; Commonwealth vs. Randall 225 Pa. 197, 73 Atl. 1109.

In the imposition of an excise tax, the rule of equality and uniformity as guaranteed by Article Nine of the Constitution is not involved. Excise taxes have been imposed in many ways but so long as they are reasonable, not unjustly discriminatory, nor arbitrary, whimsical, irrational, grossly oppressive, plainly unequal or contrary to common right, they will be upheld. State *ex rel* Bonsteel vs. Allen 83 Fla. 214, 91 So. 104; Jackson vs. Neff 64 Fla. 326, 60 So. 350; Peninsular Casualty Co. vs. State 68 Fla. 411, 67 So. 165; Amos vs. Gunn 84 Fla. 285, 94 So. 615; Amos vs. Matthews 99 Fla. 1, 126 So. 308; Jerome H. Sheip Co. vs. Amos 100 Fla. 863, 130 So. 699.

Perfect equality in the operation of laws imposing a tax on real estate is recognized as impossible. It is even more difficult to arrive at uniformity in the operation of an excise tax, but mere inequality or lack of uniformity in its operation is no bar to its enforcement. It must be so arbitrary and oppressive as to clearly amount to a denial of due process or of equal protection and where, as here, the public health and safety are not involved, the ultimate test is whether or not the excise so imposed is so arbitrary and oppressive as to prohibit a great number, if not all persons from pursuing occupations otherwise lawful. Jerome H. Sheip Co. vs. Amos, supra; American Uniform Co. vs. Commonwealth 237 Mass. 42, 129 N. E. 622.

It is generally recognized that in the application of an excise tax, some objects of taxation will bear the burden while others will be relieved of it, one business will be selected while another will be omitted and one class of property will be taxed while another will go tax free. This fact, however, or the fact that it bears more heavily on one person or corporation than on another, does not vitiate

the exercise. Clay Products Co. vs. United States 52 Fed. (2nd) 1033.

The rule is thus recognized in this State that the judiciary cannot nor will it attempt to prescribe to the Legislature limitations on its power and while there is no express limitation on the power of the Legislature to provide an excise or tax on licenses, nevertheless, the organic requirements of due process and equal protection must be observed in imposing such a tax. Roach vs. Ephren 82 Fla. 523, 90 So. 609; State *ex rel.* Bonsteel vs. Allen 93 Fla. Fla. 214, 91 So. 104, 26 A. L. R. 735; Hiers vs. Mitchell, 95 Fla. 345, 116 So. 81; Jackson vs. Neff 64 Fla. 326, 60 So. 350; Jerome H. Sheip Co. vs. Amos 100 Fla. 863; 130 So. 699; Gray vs. Central Fla. Lumber Company, supra.

An examination of the Federal and Florida cases on this point discloses that the Federal rule governing the imposition of excises is more liberal than the rule in this state. Here, we require the observance of due process and equal protection in the imposition of such taxes while the Federal Courts hold that the reasonableness of an excise imposed for revenue purposes is a legislative prerogative that will not be inquired into by the courts either as to the amount of the tax or the property on which it is imposed. It makes no difference if the tax in practical effect operates to suppress the business taxed, that fact alone will not render an act of Congress unconstitutional. Hiers vs. Mitchell, supra; Jerome H. Sheip Co. vs. Amos, supra, both citing Federal cases supporting this rule. Others are cited in this opinion.

The second net result extracted from these opinions is that as to equal protection, the decisions of the Florida and Federal Courts are in harmony. In other words, there is no such thing as degree when we come to the admeasurement of equal protection while as to due process, the Federal rule is much more liberal than the state rule, due largely to the weight attached to the determination of that question by the legislative body.

But Appellants contend that in consideration of the factual situation in this case, due process and equal protection are denied them in that Subsections One, Two, Four, Six, Eight, and Ten of Section Five of Chapter 15624 as above quoted, create arbitrary and unreasonable discriminations between single store retail merchants and chain or multiple store retail merchants.

The answer to this contention turns on whether or not the classification of retail stores for purposes of taxation under Subsections One, Two, Four, Six, Eight, and Ten of Section Five, Chapter 15624, is reasonable, not arbitrary or capricious and rests upon some reasonable distinction in the subjects classified. In the nature of things, there cannot be an exact inclusion and exclusion of the persons or things classified. Ozan Lumber Co. vs. Union County Nat. Bank of Liberty 207 U. S. 251, 28 Sup. Ct. Rep. 89, 52 L. Ed. 195.

The Subsections of Section Five as enumerated first lay an annual license tax on retail stores, increasing progressively with the number of stores under the same general management and located in a single county. The act in other words classifies or points out the chain store and imposes a different measure of taxation on it for the privilege of doing business from that imposed on stores owned and operated as individual units. Appellants say that there is no substantial difference between the business done and the manner of operating the chain store and the individual unit that would justify the classification on the basis of which the additional tax is imposed.

The record discloses material points of difference between chain stores and independently owned units. Such differences consist in the method of management, group control of store operation, frequent turnover, cooperative advertising, cooperative buying, suitable location, display of goods, training of employees, the combination of wholesale and retail functions under one control, and serving the

public in the manner the public desires to be served. These differences were ample basis for the classification complained of.

Appellants assert that like advantages are available to independent stores and when properly applied will produce the same or similar results. This assertion may be true in part but in the nature of things it cannot be true as a whole. It is common knowledge that the chain store possesses many distinguishing features that give it an advantage over the independent store dealing in the same commodities. Its method of integration for purposes of cooperative buying, community advertising, traffic in "selling talk," displaying, serving the public, unqualified control of wholesaling and retailing, and commanding capital could, under no circumstances become available to the independent store with such results as flow therefrom to the chain store.

This phase of the question is conclusively settled against the contention of Appellants by the Supreme Court of the United States in State Board of Tax Commissioners vs. Jackson 283 U. S. 527, 51 Sup. Ct. Rep. 540, 75 L. Ed. 1248. Speaking through Mr. Justice Roberts, that Court said:

"The power of taxation is fundamental to the very existence of the government of the states. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations, Bell's Gap R. Co. vs. Pennsylvania 134 U. S. 232, 33 L. Ed. 892, 10 S. Ct. 533; Southwestern Oil Co. vs. Texas, 217 U. S. 114, 54 L. Ed. 688, 30 S. Ct. 496; Brown-Forman Co. vs. Kentucky, 217 U. S. 563, 54 L. Ed. 883, 30 S. Ct. 578. The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable dis-

tinction, American Sugar Ref. Co. vs. Louisiana 179 U. S. 89, 45 L. Ed. 102, 21 S. Ct. 43, or if any state of facts reasonably can be conceived to sustain it. Rast vs. Van Deman & L. Co., 240 U. S. 342, 60 L. Ed. 679, L. R. A. 1917A, 421, 36 S. Ct. 370, Ann. Cas. 1917B, 455; Quong Wing vs. Kirkendall 223 U. S. 59, 56 L. Ed. 350, 32 S. Ct. 192. As was said in Brown-Forman Co. vs. Kentucky, supra . . . ''

State Board of Tax Commissioners vs. Jackson, just quoted from, is known as the Indiana Chain Store Case. The Indiana Act upheld in that case was different in some respects from the Florida Act involved in this case but these differences were not material to a disposition of the point under review. The Indiana Act applies to wholesale and retail stores, the Florida Act applies only to retail stores, the Indiana Act imposes a license fee of from three to twenty-five dollars, the Florida Act imposes a license fee of from five to fifty dollars when the stores are located in a single county and fifteen to fifty dollars when located in different counties, the Indiana Act graduates the license tax on the basis of the number of stores located in the state under a single management while the Florida Act graduates the license tax, first, on the basis of the number of stores located in a single county under a single management, and second, on the basis of the number of stores located in different counties under a single management.

As a second phase to this question, Appellants contend that in consideration of the factual situation in this case, the provision of Subsections Three, Five, Seven, Nine, and Eleven of Section Five of the Florida Act imposing a greater burden on retail merchants doing business in different counties under the same management than that imposed on retail merchants doing business in a single county under the same management is an arbitrary and an unreasonable discrimination.

It may be admitted that this question was not directly

before the Court in the Indiana Case, however, what we have said in this opinion on the subject of classification is. applicable to the latter contention. It may be said further that nothing less than an arbitrary exercise of power can be stricken down under the Fourteenth Amendment. Judicial interference cannot be predicated solely on unjust and oppressive legislation, neither can invalidity stand on the mere fact that the act appears faulty. Metropolis Theatre Co. vs. City of Chicago 228 U. S. 61, 33 Sup. Ct. Rep. 441, 57 L. Ed. 730.

In Toyota vs. Territory of Hawaii, 226 U. S. 184, 33 Sup. Ct. Rep. 47, 57 L. Ed. 180, the Supreme Court upheld a statute of Hawaii imposing a license tax of six hundred dollars on auctioneers in the district of Honolulu and a like tax of fifteen dollars on auctioneers in each other taxing district in the island. The act was assaulted on the ground that it deprived an auctioneer in Honolulu of his property without due process of law and denied him the equal protection of the law. The opinion in this case was written by the present Chief Justice before his retirement from that Court.

In Pacific American Fisheries vs. Territory of Alaska 269 U. S. 269, 46 Sup. Ct. Rep. 110, 70 L. Ed. 270, an act of the Territory of Alaska was upheld which imposed a surtax on an upward graduated scale per case of certain types of canned fish. It was there contended that the act discriminated against large canneries in favor of small ones but the act was upheld on the theory that classification for taxes on the basis of the amount of the corpus taxed had frequently been approved.

In Hayes vs. Missouri 120 U. S. 68, 7 Sup. Ct. Rep. 350, 30 L. Ed. 578, a statute of the State of Missouri was upheld which provided that in the trial of capital cases, in cities having a population of over 100,000 inhabitants, the state should be allowed fifteen peremptory challenges to

jurors, while elsewhere in the state it was allowed only eight peremptory challenges in such cases. It was contended that the act denied to one accused of murder in a city of more than 100,000 the equal protection of the law.

In Metropolis Theatre Co. vs. City of Chicago 228 U. S. 61, 33 Sup. Ct. Rep. 441, 57 L. Ed. 730, an ordinance of the City of Chicago was upheld which imposed a license tax on places of amusement, graduated according to the price of admission for single seats. If the price of admission was one dollar, the license tax was one thousand dollars. If the price of admission exceeded fifty cents but was less than one dollar the license tax was four hundred dollars. The classification was sustained in the face of a showing that some theaters charging the higher admission received less revenue than those charging the lower admission.

The foregoing including the following cases on the question of classification might be enlarged ad infinitum. In addition to supporting the law of this case they demonstrate the utter impossibility of casting a taxing statute under our social structure that does not contain some inequalities and work hardships in individual cases. And while it has been repeatedly pronounced that there is no limit to the discretion of the Legislature in classifying trades, occupations, and businesses for purposes of taxation so long as the classification rests on reason and is not arbitrary or capricious, caution should be exercised in all instances to reduce hardships and inequalities to the irreducible minimum. Clark vs. City of Titusville 184 U. S. 329, 22 Sup. Ct. Rep. 382, 46 L. Ed. 569; Central Lumber Co. vs. State of South Dakota 226 U. S. 157, 33 Sup. Ct. Rep. 661, 57 L. Ed. 164; Quong Wing vs. Kirkendall 223 U. S. 59, 32 Sup. Ct. Rep. 192, 56 L. Ed. 350; Southwestern Oil Co. vs. State of Texas 217 U. S. 114, 30 Sup. Ct. Rep. 496, 54 L. Ed. 688; Armour & Co. v. Commonwealth of Virginia 246 U. S. 1, 38 Sup. Ct. Rep. 267, 62 L. Ed. 547; Alaska Fish

Salting & By-Products Co'. vs. Smith 255 U. S. 44, 41 Sup. Ct. Rep. 219; 65 L. Ed. 489; Ohio Oil Co. vs. Conway 281 U. S. 146, 50 Sup. Ct. Rep. 310, 74 L. Ed. 775; Great Atlantic and Pacific Tea Co. et al. vs. Maxwell, decided October 26, 1931, cited in Sup. Ct. Rep. November 15, 1931; Reyman Brewing Co. vs. Vrister, 179 U. S. 445, 21 Sup. Ct. Rep. 201, 45 L. Ed. 269; Peninsular Industrial Ins. Co. vs. State 61 Fla. 376, 55 So. 398; Lindsley vs. Natural Carbonic Gas Co. 220 U. S. 61, 31 Sup. Ct. Rep. 337, 55 L. Ed. 369; The Packer Corporation v. Utah, Supreme Court of U. S., decided February 23, 1932.

We think that in either event the classification complained of may be held to withstand the challenge directed against it. We see nothing in the factual situation to differentiate this aspect of the case from State Board of Tax Commissioners vs. Jackson, supra, neither do we see anything in the classification either as to stores under the same management in a single county or under the same management in different counties that would do violence to the rule of due process or equal protection as announced in the decisions of this Court. Owners of chain stores are classified on two bases and all in each class are treated alike. If located in different counties the necessary implication of larger volume, wider circulation, growing profits, business expansion and larger opportunity under group control must follow. These facts are ample to support that classification.

As a third phase to the main question Appellants contend that the ultimate purpose and effect of Chapter 15624 is to throttle competition, repress the diligent in business, and to impose a burden on superior skill, initiative, and industry, contrary to the American idea of inalienable rights as expressed in the Declaration of Independence and the Declaration of Rights.

Primarily this contention presents a question of eco-

nomics or policy rather than one of law. The policy and expediency of an excise tax is always a question for legislative determination. The objects on which it is imposed, the amount of the tax, and the standard employed to measure the tax are matters in which legislative discretion may take a wide range. The judiciary is not authorized to revise the judgment of the Legislature on these matters even though it impose a burden on superior skill, initiative, and industry unless that burden is shown to be unequal, grossly oppressive, or offends against every impulse of common right and justice.

We know of no reason nor do Appellants cite any for relieving superior skill, initiative, and industry from the payment of a tax. The sole justification for any form of taxation is to support the institutions of government. Our taxing laws, organic and statutory, were cast to meet the needs of an agricultural country when practically all our values were in land. If they cannot be construed and recast to meet the needs of this industrial era when the major portion of our values are represented by personal property then the burden of government is inequitably distributed and equal protection as contemplated by the Constitution is defeated.

It is next contended that the proviso to Section Eight of Chapter 15624 exempting filling stations engaged exclusively in the sale of gasoline and other petroleum products creates an arbitrary and unreasonable discrimination against all owners of retail stores contrary to due process and equal protection.

The proviso to Section Eight applies only to filling stations engaged exclusively in the sale of gasoline and other products of petroleum. Exclusive of other considerations there is ample ground for the exemption of filling stations from the provisions of the act. They are inherently different from ordinary retail stores and a heavy excise tax is collected from gasoline and other petroleum products sold

by them. (Chapter 15659 Acts of 1931, Laws of Florida.) If a retail store as contemplated by Chapter 15624 was operated in connection with the filling station, it would be subject to the tax imposed. Such a classification or distinction is far from being palpably arbitrary and the rule is that it must be upheld if there be any conceivable state of facts on which it can rest. Southern Grocery Stores Inc. vs. South Carolina Tax Commission, United States District Court, Eastern District of South Carolina, decided February 2, 1932, opinion by Judge John J. Parker is conclusive of this point. See also Rast vs. Van Deman & Lewis Co. 240 U. S. 342, 36 Sup. Ct. Rep. 370, 60 L. Ed. 679, L. R. A. 1917A 421; Ann. Cas. 1917B, 455; Wampler vs. Lecompte 282 U. S. 172, 51 Sup. Ct. Rep. 92, 75 L. Ed. 276; South Carolina Power Co. vs. South Carolina Tax Commission 52 Fed. (2nd) 515.

Other alleged invalidities interposed by Appellants relate to the exemption of wholesale merchants, the penalty of twenty-five per cent. of the license tax imposed when renewals for licenses are not made on or before the tenth day of November of each year, the administration of the act and burden on interstate commerce.

We have examined each of these questions and find them to be without merit. The license year under the act runs from October first to October first of each year. No license lapses prior to October 31, all licensees who have not renewed are then notified by registered mail and are required to renew on or before November 10, or suffer the twenty-five per cent. added to the amount of their license fee as penalty for not complying promptly. Identical or similar provisions are carried in most State and Federal revenue acts and have been often upheld.

The decree of the chancellor is accordingly affirmed.

Affirmed.

BUFORD, C.J., AND WHITFIELD, AND DAVIS, J.J., concur.

ELLIS AND BROWN, J.J., dissent.

DAVIS, J. (Concurring).—I concur in the opinion and judgment, but deem it of importance to point out that one proposition was argued by appellants which is not discussed in the very able opinion prepared by MR. JUSTICE TERRELL to express the views of a majority of the Court covering the constitutional propositions decided.

Appellants argue that the Comptroller's *administration* of the Act is arbitrary and unreasonable, in that the Comptroller, under the advice of the Attorney General, has announced that the provisions of the Act will not be enforced against certain persons, firms and corporations which appellants say are as much subject to the Act as they are, but are being exempted from the burdens thereof, by unlawful and unjustified administrative rulings.

Assuming, but not deciding, that all these complaints are true, and that the Act is in fact being so unjustifiably enforced as to deny to appellants the equal protection of the laws by reason of its administration, appellants have a plain, complete and adequate remedy at law to coerce the non discriminatory administration of the Act by mandamus against the tax officers to compel them to apply the provisions of the statute to all who are legally subject thereto. See State ex. rel. Dofnos Corporation vs. Lehman, 100 Fla. 1401, 131 Sou. Rep. 333, 3rd headnote.

To enjoin the enforcement of the Act against appellants, because others than appellants are unjustly and unlawfully escaping from the tax the Act imposes, would be to increase, not diminish, the denial of the equal protection of the laws complained of, by adding to the class of those already unlawfully exempted by administrative rulings, an additional class consisting of appellants.

Two wrongs do not make a right. Neither does the fact that tax officers commit a wrong in favor of one, entitle another to the privilege of that same wrong in his favor.

All citizens and tax payers are entitled to a fair, im-

partial, just and equal administration of the revenue laws, which right, as this Court has pointed out, may be enforced by mandamus against officials who would try to do otherwise. The remedy for unequal administration is therefore not by injunction to cripple enforcement, but by mandamus to strengthen it.

WHITFIELD AND TERRELL, J.J., concur.

---

### STATEMENT OF FACTS.

By BROWN, J.—This appeal is taken from an interlocutory order granting the motion of appellees to dismiss the amended bill brought by the appellants to enjoin the enforcement of Chapter 15624 of the Laws of Florida adopted in 1931, on the ground of the alleged unconstitutionality of said act.

Section 5 of the act reads:

"Section 5. Every person, firm, corporation, association or co-partnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this State, under the same general management, supervision or ownership shall pay the license fee hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fee prescribed in Sections 2 and 4 of this Act.

"The license fees herein prescribed shall be as follows:

"(1) Upon one store, the annual license fee shall be Five Dollars for each such store.

(2) Upon two stores or more, but not exceeding fifteen stores, where the same are located in any one county, the annual license fee shall be Ten Dollars for each such additional store.

(3) Upon two stores or more, but not to exceed fifteen stores, where the same are located in different counties, the annual license fee shall be Fifteen Dollars for each such additional store.

(4)  Upon each store in excess of fifteen, but not to exceed thirty, when all are located in any one county, the annual license fee shall be Fifteen Dollars for each such additional store.

(5)  Upon each store in excess of fifteen, but not to exceed thirty, where the same are located in different counties, the annual license fee shall be Twenty Dollars for each such additional store;

(6)  Upon each store in excess of thirty, but not to exceed fifty, where all are located in any one county, the annual license fee shall be Twenty Dollars for each such additional store.

(7)  Upon each store in excess of thirty, but not to exceed fifty, where the same are located in different counties, the annual license fee shall be Thirty Dollars for each such additional store.

(8)  Upon each store in excess of fifty, but not to exceed seventy-five stores, where all are located in any one county, the annual license fee shall be Thirty Dollars for each such additional store.

(9)  Upon each store in excess of fifty, but not to exceed seventy-five, where the same are located in different counties, the annual license fee shall be Forty Dollars for each such additional store.

(10)  Upon each store in excess of seventy-five where all are located in any one county, the annual license fee shall be Forty Dollars for each such additional store.

(11)  Upon each store in excess of seventy-five, where the same are located in different counties, the annual license fee shall be Fifty Dollars for each such additional store.

In addition to the above amounts, Three Dollars for each and every One Thousand Dollars of value of stock carried in each store or for sale in such store.''

Section 11 of the act provides that:

Section 11.  A county license tax of twenty-five per cent. of the state license tax shall be levied and imposed upon each store as herein defined and each incorporated municipality of the State of Florida is authorized to levy a municipal license tax of twenty-five per cent. of the State tax imposed by this Act, provided that the tax levied by or for the several counties and munici-

palities shall be graduated only on the number of stores situate in such county or municipality, respectively, notwithstanding the applicant may own other stores beyond the limits of such county or municipality, as the case may be. In all cases coming within this Section of this Act, where the license must be obtained from the Comptroller of the State of Florida, the county and municipal taxes shall be paid by the applicant to the Comptroller and immediately remitted to the proper officers of the several counties and municipalities of the State.

The plaintiffs, Louis K. Liggett Company, owning and operating 22 retail drug stores in various counties in Florida, Winn & Lovett Grocery Company, owning and operating 58 retail grocery stores in various counties in this State, and Paxson's Inc., owning and operating seven shoe stores in Florida and one in Georgia, all being corporations, bring this as a class suit, for the benefit of plaintiffs and all other merchants similarly situated who may desire to avail themselves of the benefits thereof. (See section 14, Chancery Procedure Act of 1931). The following parties filed petitions asking that they be allowed to intervene, on account of their interest in the subject matter, and, while setting up facts peculiar to their own situation, adopted the allegations of the bill attacking the constitutionality of the act: Independent Furniture Company; The Nunnally Company, G. R. Kinney Shoe Co., Southern Stores Corporation, South Florida Stores Corporation, Melville Shoe Corporation; J. C. Penney Company, F. W. Woolworth Company, Montgomery Ward & Company, the Great Atlantic & Pacific Tea Company and the United Cigar Stores Company, all owning and operating retail stores, situated at different points in Florida. Montgomery Ward Company allege that they operate only one store in Florida, but the other petitioners allege that they own and operate varying numbers of stores in this State, running from three to 226 stores each, most of them operating

stores in more than one county. Several of these petitioners were by order of the court permitted in intervene.

This cause is now before this court on an application for a temporary restraining order, pending a determination of the appeal upon its merits, thereby involving the power of the court under sec. 5 of Art. V of the Constitution. Autuono v. City of Tampa, 87 Fla. 82, 99 So. 324. But the court sees fit to dispose of the appeal upon its merits, as has been done in a number of instances involving matters of public importance. Crawford v. Gilchrist, 64 Fla. 41, 69 So. 963; Carlton v. Mathews, 137, So. 815.

The act is first attacked upon the ground that the subject matter was not within the Governor's proclamation of June 6, 1931, calling the extra session during which this act was adopted. It is not contended that the act was not finally adopted by a "two-thirds vote of each house," as required by section 8 of Art. IV of the Constitution, but that certain amendments and the motion of concurrence in the House are not shown to have been adopted by a two-thirds vote. Whether this would or would not have been essential, if the act was outside the subjects named in the Governor's call, it is contended by appellees that the second subject dealt with in the Governor's proclamation, commencing with the words, "To provide new sources of revenue," is sufficiently broad to cover an act of this nature.

The ground of appellants' attack upon the constitutionality of the act which are most earnestly insisted upon in the arguments and briefs are briefly as follows:

1. That subsections 1, 2, 4, 6, 8 and 10 of section 5, as applied to the factual situation set forth in the amended bill and admitted by the motion to dismiss, create arbitrary and unreasonable discriminations between single store retail merchants and chain or multiple store retail merchants doing business in the same county, contrary to the "due

process'' and ''equal protection of the laws'' clause of the Fourteenth Amendment to the Federal Constitution, and the ''equal civil rights'' and ''due process'' clause of sections 1, 4 and 12 of the Declaration of Rights embraced in the Constitution of Florida.

2. That subsections 1 to 11 inclusive of section 5, as applied to the facts alleged in the bill, create arbitrary and unreasonable discriminations between retail merchants doing business in only one county, whether single store or multiple store merchants, and merchants such as plaintiffs doing business in different counties, contrary to the above designated constitutional provisions; and that section 11 of the act, undertaking to provide for county and municipal license taxes for retail merchants, is predicated upon the fees required by section 5, and is void for the same reasons.

3. That provisions of section 8, the last clause of section 5, and section 2 of said Act, exempting wholesale merchants (who remain subject to the license tax provided for by section 1197 Compiled General Laws), as applied to the ''factual situation'' set up in the amended bill, create arbitrary and unreasonable discriminations against all chain or multiple retail merchants who own and operate warehouses, that stand in the same relation to their retail units as the wholesale merchant bears to single store retail merchants, contrary to the aforesaid provisions of the State and Federal Constitutions severally.

4. That the proviso contained in section 8 of said Act undertaking to exempt filling stations engaged exclusively in the sale of gasoline and other petroleum products, as applied to the ''factual situation'' set up in the amended bill, admitted by the motion to dismiss, creates an arbitrary and unreasonable classification and discrimination against all other owners of retail ''stores'' as defined by said Act, contrary to the aforesaid provisions of the State and Federal Constitutions severally.

636

5. That on account of the invalidity of the several parts of said Act, as aforesaid, the elimination thereof would produce a result not intended by the legislature, and hence said Act must be declared void in its entirety.

6. That the Comptroller's attempted administration of the Act, as set forth in section 15 of the amended bill, undertaking to exempt furniture dealers, filling stations that sell tires and tubes, automobile dealers, cigar stores, restaurants, and sundry other classes of store operators, regardless of whether single store operators or chain store operators, creates arbitrary and unreasonable discriminations against the complainants and intervenors severally in this cause, contrary to the ''due process' clauses and ''equal protection of the laws'' clauses of the State and Federal Constitutions severally as aforesaid.

The bill sets forth the origin and history of the development of the present-day chain store or multiple store method of merchandising, which it alleges to be a natural and logical outgrowth of economic changes, especially those taking place since the World War, and charges that the act under review is a part of a widespread campaign to destroy chain store merchandising for the benefit of those merchants who refuse to adjust their businesses to conform to the changed economic conditions, and constitutes, under the guise of a revenue measure, an effort to destroy or arbitrarily burden a method of merchandising which has become an economic necessity, in order to eliminate waste and shorten the spread between the producer and the consumer, which it is alleged was pointed out by the Department of Commerce when the present President was at the head of that Department. That said Department stated that at that time about one-third of every American dollar spent in the stores in this country covered the actual cost of production, while the other two-thirds was absorbed in the process of distribution, whereas by a recent investiga-

tion by the Harvard Board of Business Research it has been found that in the grocery field chain stores are able to operate on less than 20 per cent. of the consumer's dollar, of which 1¾ per cent. is net profit, leaving 80 per cent. to go to the producer. Also, that similar changes have been accomplished in other fields by chain stores handling other classes of merchandise, thus going a long way towards eliminating the "tragic economic waste" of which Mr. Hoover spoke. That the policy so inaugurated had also been fostered by state governments, including Florida, by the enactment of the act of 1923 authorizing the formation of co-operative marketing associations, the declared policy of which was to eliminate speculation and waste between the producer and the consumer.

That under this act, which became a law without the Governor's approval on July 3, 1931, Cohen Brothers, the largest department store in Jacksonville, covering a whole block, will only have to pay a license fee of $5.00, while complainant Winn & Lovett Grocery Co. would have to pay $40.00 per store on each of its 58 stores in excess of fifty stores, and lesser graduated amounts for each store below fifty; and Louis K. Liggett Company, on its 22 stores, $20.00 per store in excess of fifteen. That like arbitrary differences exist between the single store operator and Paxson's Inc., owning and operating seven shoe stores in different counties; which discriminations are based purely upon the number of roofs under which a merchant does business, and whether located in more than one county.

That George C. Blume owns and operates in Duval County thirty-seven grocery stores, known as "Whiddon's Stores," which are similar to and operated under the same circumstances and in the same manner as the twenty-three grocery stores in Duval County owned and operated by complainant, Winn & Lovett Grocery Company but that under the arbitrarily increased fee on stores operated in

more than one county, embraced in the schedule set forth in section 5 of the Act, complainant is required to pay a State license fee averaging of $24.74 per store on each of its stores in Duval County, whereas the Whiddon Stores are only required to pay $13.78 per store on each of its stores located in the same county. That similar discriminations exist as against the other complainants, all of whom operate stores in more than one county, and that there is no justification whatever for such discrimination, based as it is solely upon the fact that a merchant does business in more than one county in this State.

That said Louis K. Liggett Company operates its drug stores in several counties of Florida in the same may that other drug stores in the county are operated whether owned singly or otherwise. That the merchandise dispensed at the soda founts in such stores is very largely purchased locally, consisting of such items as milk, foodstuffs, ice cream, nuts, fruits, etc. That said company purchases cigars, cigarettes and tobacco from the manufacturer and shipments are made directly to the stores where needed, substantially in the same manner that those classes of goods are purchased and received by the owners of single drug stores. That some of the medical and toilet goods are purchased by the Company and collected in its principal warehouse in New York City, from which shipments in interstate commerce are made weekly or bi-monthly on requisition by the individual stores located in Florida and other States. Such frequent shipments are necessary in order to permit more rapid turnovers, keep fresh goods in retail units and prevent the accumulation of old or shelf-worn stock. That the owner of a single drug store ordinarily buys his supply of medical and toilet goods from the manufacturers, jobbers or wholesalers and shipments are made either from some factory or from Florida wholesale warehouses. That no advantage results to said company by buying merchandise

in large quantities and centralizing the same in a central warehouse, but the operation of such central warehouse involves the expense of the capital investment in such stock or merchandise, the interest, taxes and insurance thereon, investment in warehouse, and freight paid from the warehouse to the several stores. That none of these items of expense or burdens are borne by the owners of single drug stores who ordinarily purchase their merchandise locally from brokers or wholesalers. That none of the stores operated by this complainant increase the fire hazard or endanger the health or morals of the community or require increased or additional police protection different from the stores operated by other druggists doing a similar business. That the twenty-two Liggett stores operated in Florida are burdened with State license fees in the aggregate amount of $355.00, whereas twenty-two individually owned drug stores competing with the Liggett stores are assessable with State license fees in the sum of only $110.00.

That complainant, Louis K. Liggett Company, has competition in Florida not only from individually owned drug stores, but also from a great number of drug stores individually owned but co-operatively affiliated with McKesson and Robbins Inc., wholesale dealers in drugs, toilet articles, and other goods, wares and merchandise, operating throughout the United States. That the drug stores so affiliated with McKesson and Robbins constitute what is commonly known as "voluntary chain" stores but which would be more properly designated as a "co-operative chain" store. That the aforesaid manufacturer-wholesaler-retailer combination in the production and distribution of drugs enables the individual single store owner affiliated therewith to sell at retail under the same terms and conditions as those established by chain store systems and department stores. That in such McKesson retail drug

stores the consumer can find in almost any neighborhood in the United States drugs at the same prices and as extensively advertised as in chain drug stores. That McKesson and Robbins, Inc., have four wholesale distributing points in the State of Florida. That the wholesale distributor at the several points enters into contracts or arrangements with the owner or operators of singly owned drug stores whereby such owners agree to purchase from such distributor in that locality in the State of Florida all of the drugs, toilet articles and other goods handled in drug stores or such of them as may be carried and sold by the distributing warehouse, in consideration of which the distributor of the McKesson system agrees to give to such drug store owner whatever benefits may arise from the volume resulting from his purchases and buying with the purchasers of all other retailers and drug store owners affiliated with said system, and also agrees and does furnish to each retail store owner the benefit of group advertising, including National Radio advertising and merchandising service supplied by and through said McKesson organization. That there are owned and operated in the City of Jacksonville, thirty-five individually owned drug stores affiliated with the McKesson system, while at other points in the State of Florida there are numbers of stores thus affiliated, and that the total number of independent drug stores in the United States and elsewhere affiliated with said McKesson system is 57,000. That said McKesson retail stores are able to purchase merchandise substantially at the same price and on the same terms as your orator, and the total sales made by such stores in Florida amount to a great many times the total sales of the twenty-two stores operated by said Liggett Company, and enjoy all of the advantages accruing from quantity buying, and none of the disadvantages resulting from capital invested in quantity purchased, in warehouses, insurance, etc. Neverthe-

less, each of such individually owned drug stores affiliated with the McKesson system is required by said Act to pay a State license fee of only $5.00 each, whereas complainants stores must pay a State license of $16.00 each, thus imposing an arbitrary and oppressive burden of taxation upon complainant only because it owns and operates a number of stores under one ownership and management.

The bill also alleges the methods pursued by the Winn and Lovett Grocery Company in the operation of its fifty-eight grocery stores in various counties of the State, and alleges that they are operated in the same manner that similar grocery stores are operated by owners of only one such grocery store; and that the operation of such stores does not increase the fire hazard or endanger the health or morals of the community or require increased or additional police protection any more than stores individually owned. That there is very keen competition in the grocery business in Florida, although many chain grocery store owners operate in the State. That the "Better Food Stores" are a group of individually owned grocery stores affiliated with Lewis-Chitty Consolidated Grocery Co., which does a large wholesale grocery business in the City of Jacksonville, with branch wholesale houses at Orlando, Tampa, Cocoa, Miami and other points. That the name "Better Food Stores" is a trade name belonging to a corporation whose corporate name is "Better Food Stores Inc." That one of the organizers of said corporation is A. B. Chitty, the President and controlling stockholder of said Lewis-Chitty Consolidated Grocery Co. That the formation of such co-operative groups as said "Better Food Stores" has been encouraged by the discrimination of said Act. That on June 18, 1931, another grocery corporation was organized under the name of "Florida Food Stores, Inc.," by certain individuals in the grocery business at Daytona Beach, Florida, and under the name a number of individually

owned grocery stores have been affiliated for co-operative purchases in the same way as the aforesaid group operating under the name of ''Better Food Stores.'' And in like manner other co-operative groups of independently owned grocery stores have been formed under trade names, or otherwise since the passage of said Act, being assured that they could so operate without being subjected to the discriminatory. graduated license fees provided by the Act. That although the said ''Better Food Stores'' group were organized on June 8, 1931, about the time said Act was passed, or introduced into the legislature, the same has had a very rapid growth, there being forty-two individually owned grocery stores in the Duval County group, and other groups have been formed at several other points where the said Lewis-Chitty Company has branches of its wholesale grocery business. That by such affiliated and co-operative organizations single grocery store owners have adopted the best feature of chain store merchandising and have secured substantially all the benefits derived therefrom, while at the same time they have avoided the burdens of capital investments, insurance, etc., incident to the carrying of a large stock in a central warehouse, such as is maintained by the Winn & Lovett Grocery Company in Jacksonville and Sanford. That the latter company also finds it necessary to maintain a force of employees and a fleet of trucks to deliver merchandise from its warehouse in Jacksonville to its retail units in Duval County and outlying towns, whereas the individually owned stores affiliated as ''Better Food Stores'' have no such expense and can obtain daily deliveries by motor trucks as needed from the Lewis-Chitty Consolidated Grocery Company with which they are under contract. That such co-operative groups are not local merely to Jacksonville and other parts of Florida, but such methods of co-operative merchandising prevail generally throughout the United States. That the

largest organization of independently owned grocery stores in the United States is known as "The Independent Grocers Alliance," which organization now embraces thirty-eight states, has one hundred and thirty jobbing or supply depot centers and has affiliated with it 14,000 retail grocery stores, with a buying power of $500,000,000.00 per year. That the scheme of organization and affiliation of Independent Grocers Alliance and the owner of individual grocery stores is very similar to the relation which exists between the members of said Better Food Stores and the Lewis-Chitty Consolidated Grocery Company or its intermediary, Better Food Stores, Inc. That the retail grocer affiliated with the Independent Grocers Alliance pays $3.50 per week to the Independent Alliance jobber, who in turn furnishes the retailer with groceries at reduced prices, and also newspaper advertising, copy mats, display cards, price-posters, and various up-to-the-minute merchandising helps. That the newspaper advertising is placed by the I. G. A. wholesalers in his local paper, but the copy and layouts are furnished by the I. G. A. advertising counsel. That the I. G. A. advertising appears in 283 dailies and 454 weeklies, and calls for an annual expenditure of $757,000.00, in addition to which there is an annual expenditure of $250,-000.00 for National magazine and Radio advertising. That there are in Florida, affiliated with the Independent Grocers Alliance eighty-three retail grocery stores in Tampa, St. Petersburg, and on the West Coast of the Peninsula who get their supplies from Perkins and Sharpe, whose warehouse is situated in Tampa and who are the I. G. A. Jobbers in that territory. That there are many other voluntary chains or co-operative groups in the United States not only in the grocery business, but in other lines and independent store owners so operating have adopted the best features of modern merchandising promulgated by chain or multiple store operators, which features are set forth with some detail in the bill. That although mem-

bers of such voluntary chains or co-operative groups are doing business in the same way, the Act under review undertakes to impose excessive burdens of State license taxes upon complainants and other chain store operators similarly situated, while not placing the same corresponding burdens upon members of said voluntary chains or co-operative groups. That the legislature knew that the Independent Grocers Alliance was operating extensively in Florida before said Act was passed and also knew that complainants were also operating several drug, grocery and shoe stores in Florida and had been for some years prior to the passage of said Act.

That complainant, Paxson's Inc., was organized in 1929 under the laws of the State of Florida, with a capital stock of $40,000.00, its stockholders and officers being residents of this State. That it owns and operates eight retail shoe stores, one in Georgia and seven in Florida, and conducts the business in its several stores in the same manner as other shoe stores are conducted in said several localities, attempting however, to give customers better service and better values for their money, which are mere matters of competitive merchandising equally available to all other shoe merchants, whether owning only one store or many stores. That it carries comparatively the same stock of goods in each of its stores and does not own or maintain any warehouses, but buys its goods direct from the factories situated in different parts of the United States from which factories shipments are made direct to each individual store. That it buys shoes on substantially the same terms as other shoe merchants doing business in different parts of the State, whether operating single stores or many stores. That in Jacksonville, where one of the stores is located, there are shoe businesses operated in more than one location, but in no other county, and that in Cohen's department store in Jacksonville there are several departments for different grades of shoes, combined stocks of

which are greater in value than the combined value of all the stocks of complainants in its seven Florida shoe stores. That nevertheless, said large department store, including several shoe departments, will be assessed under the Act with an arbitrary license fee of only $5.00, whereas this complainant will be assessed with an arbitrary State license fee in the sum of $13.60 on each of the said shoe stores, in addition to which complainant will be required to pay $3.00 per thousand license tax on the value of its merchandise carried in its several stores plus a County license of 25 per cent. of the State tax and plus a municipal license tax of another 25 per cent. of the State tax.

That there are several other singly owned shoe stores in the City of Jacksonville which each carry a larger stock and do a larger business than complainant in all of its three stores located in said City, yet said large single shoe stores are chargeable with annual State license fees of only $5.00 each as compared with an annual State license fee against each of complainant's stores of $13.60. The bill refers to the differences between chain stores and independently owned units catalogued by the majority opinion of the Supreme Court of the United States in the case of State Board of Tax Commissioners of Indiana v. Jackson, 283 U. S. 527, 75 L. Ed., 1248, decided May 18, 1931, and alleges that regardless of what may or may not have been the then conditions of merchandising and methods used by chain store operators in the State of Indiana, such conditions and such differences do not prevail in Florida.. Each one of the differences set forth in the majority opinion in the cited case is taken up in detail by the bill and facts alleged with reference to each, tending to show that such differences do not exist in this State.

The bill also alleges that the defendant, Hon Ernest Amos, Comptroller is undertaking to administer said Chapter 15624 in a manner so as to create sundry exemptions and exceptions as to the merchants to whom it shall be ap-

plied; that the comptroller holds that wholesale grocery concerns are not covered by the new Act but continue subject to Section 1197 C. G. L. paying only $1.50 per thousand on its merchandise carried instead of $3.00 per thousand as is charged to complainant Winn & Lovett Grocery Co. upon merchandise carried in its warehouses, pursuant to the new Act; that the comptroller construes said Chapter 15624 to be inapplicable to furniture dealers, regardless of whether they operate one retail store or many retail stores, on account of the fact that Section 1149 C. G. L. provides a special graduated license tax upon furniture dealers dependent upon capital stock invested in such business. That in like manner the comptroller and the several tax collectors of the State acting upon his instructions, with the advice of the Attorney General, undertake to exempt from the provisions of said new Act, not only filling stations engaged exclusively in selling petroleum products, but also to exempt filling stations selling those products plus tires and tubes, holding that Section 1061 C. G. L. provides a graduated tax for tire and tube dealers depending upon the population of the town or city where located. That an exemption is also made in behalf of automobile dealers, whether second-hand or otherwise, because Section 1056 C. G. L. provides a graduated tax upon merchandise of that kind. That in like manner the comptroller is undertaking to exempt merchants dealing in cigars and tobacco who are taxed by Section 1120 C. G. L. Similar allegations are made with reference to hay; feed and grain dealers; restaurants and cafes, etc. That Chapter 15624 carries its own definition as to who shall be subject to the license taxes sought to be imposed thereby and repeals all laws and parts of laws in conflict therewith, and that if said Act is valid, the said exemptions sought to be allowed are unauthorized and would operate to deprive complainants of the equal protection of the law..

The bill also alleges that the Act operates to place an undue burden upon the interstate commerce business of complainants.

It is further alleged that the complainants have tendered and offered to pay the taxes lawfully assessable against them under the law existing prior to the passage of Chapter 15624 but that the tax collectors, acting under the advice of the comptroller declined to accept the same, and threatened to cause the complainants and their store managers to be prosecuted for doing business without license and to impose the 25% penalty provided in Section 4 of said Act. Wherefore, complainants pray that the court issue its writ of injunction restraining the defendants from attempting to enforce said Act of 1931 and from interfering with lawful procurement by complainants of the proper licenses under the prior law, until further order of this court, and that on final hearing such injunction may be made permanent.

The defendants filed a motion to dismiss the amended bill, which motion stated that Chap. 15624 was duly enacted; does not deny complainants equal protection of the laws; that the classification of stores made for taxation purposes by the Act is reasonable and operates equally and uniformly on all stores similarly situated. That the legislature has unlimited power and discretion in the matter of levying excise taxes, except that such taxes shall be geographically equal and uniform, and that the taxes imposed by the Act are geographically equal and uniform, and do not violate any provisions of either the State or Federal Constitutions. The Circuit Court rendered an order, after argument of the motion, denying the application for injunction and granting the motion to dismiss the bill, from which order this appeal was taken.

BROWN, J. (Dissenting).—In discussing the power of the legislature to classify persons and things, it was said by this court, speaking through MR. CHIEF JUSTICE

TAYLOR, in State vs. Jacksonville Terminal Co., 41 Fla. 363, 27 So. 221, said that the equal protection clause of the Fourteenth Amendment to the Federal Constitution does not preclude legislation reasonably classifying persons and things, and that generally it only requires the same means and methods to be applied impartially to all the constituents of a class, so that the law shall operate equally and uniformly upon all persons in similar circumstances. And the test of the reasonableness of a classification is that it must be based upon some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection.' '' Citing Mahoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 S. C. R. 594, and Dell v. Marvin, 41 Fla. 221, 26 So. 188. See also Stripling v. Thomas, 132 So. 824, S. A. L. Ry. Co. vs. Simon, 56 Fla. 545, 47 So. 1001.

This Court, speaking through MR. JUSTICE STRUM, in Sheip Co. vs. Amos, 130 So. 699, said:

"The province of the judiciary in considering an objection of the nature just stated, as applied to an excise, is limited. In the direct imposition of a state excise upon taxable privileges, the Legislature exercises a power of extensive scope. Organic requirements as to uniformity and valuation, applicable to ad valorem taxes, do not apply to excises, since the latter are not regarded as a "tax" within the meaning of constitutional limitations requiring uniformity of rates and just valuations. Jackson v. Neff, 64 Fla. 326, 60 So. 350; Heirs v. Mitchell, 95 Fla. 345, 116 So. 81. In the imposition of excises, the only organic limitations upon the state are that due process, equal protection, and contract rights shall not be burdened nor federal functions interfered with. Therefore there must be a reasonable basis of classification, and there must be geographic, as distinguished from intrinsic, uniformity. Amos v. Matthews (Fla.) 126 So. 308; Amos v. Gunn, 84 Fla. 285, 94 So. 615; Jackson v. Neff, supra; Peninsular Casualty Co. vs. State, 68 Fla. 411, 67 So. 165; Panhandle Oil Co. v. Mississippi, 277 U. S. 218, 48 S. Ct. 451, 72 L. ed. 857, 56 A. L. R.

583. See also, Newell v. Green, 159 N. C. 462, 86 S. E. 291. Unless the classification, or the amount of the tax, is purely arbitrary and unreasonable under every conceivable condition in practical affairs, the courts will not interfere.

"It is held in the federal courts that the mere fact that an excise tax, imposed for revenue purposes, operates to practically suppress the business taxed, does not render an act of Congress unconstitutional, and that it is not a part of the function of a court to inquire into the reasonableness of the excise, either as respects the amount, or the property upon which it is imposed."

"The rule in this state, however, is somewhat more stringent. This court fully recognizes the doctrine, long established, that the judicial department cannot prescribe to the legislative department limitations upon the exercise of its existing powers. That doctrine however, is consistent with the further doctrine heretofore adopted by this court that, although there is no express limitation upon the power of the Legislature to provide for a tax on licenses, nevertheless the organic requirements of *due process* and *equal protection* must be observed in imposing such a tax. See Roach v. Ephren, 82 Fla. 523, 90 So. 609.

"The rule in this jurisdiction was thus stated in State ex rel. Bonsteel v. Allen, 83 Fla. 214, 91 So. 104, 105, 26 A. L. R. 735:

" 'While it is within the power of the courts to declare laws levying license taxes void because of the unreasonable and arbitrary exercise of the state's power either in the classification or in fixing the amount of the license, such power will not be exercised unless the amount of the license tax is so great, or the classification so palpably arbitrary as to be beyond the necessities for the legislation, or equivalent to an impairment of the constitutional rights or property, or tend to prevent a great number, if not all persons, from pursuing otherwise lawful occupations which do not impair public safety, public health, or destroy property.' "

The application of this clause of the Fourteenth Amendment to state taxation statutes is thus stated in the majority

opinion by MR. JUSTICE ROBERTS, in the recent case of State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 75 L. ed. 1464, 51 S. C. 540:

"The power of taxation is fundamental to the very existence of the government of the states. The restriction that it shall not be so exercised as to deny to any the equal protection of the law does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations. Bell's Gap. R. Co. v. Pennsylvania, 134 U. S. 232, 33 L. ed. 892, 10 S. Ct. 533; Southwestern Oil Co. v. Texas, 217 U. S. 114, 54 L. ed. 688, 30 S. Ct. 496; Brown-Forman Co. vs. Kentucky, 217 U. S. 563, 54 L. ed. 883, 30 S. Ct. 578. The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, American Sugar Ref. Co. vs. Louisiana, 179 U. S. 89, 45 L. ed. 102, 21 S. Ct. 43, or if any state of facts reasonably can be conceived to sustain it. Rast v. Van Deman & L. Co. 240 U. S. 342, 60 L. Ed. 679, L. R. A. 1917a, 421, 36 S. Ct. 370, Ann. Cas. 1917B. 455; Quong Wing v. Kirkenhall, 223 U. S. 59, 56 L. ed. 350, 32 S. Ct. 192. As was said in Brown-Forman Co. v. Kentucky, supra,:

'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'

It is not the function of this court in cases like the present to consider the propriety or justness of the tax, to seek for the motives or to criticize the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations separately classified. Such differences need

not be great. The past decisions of the court make this abundantly clear.''

In the opinion of the four dissenting Justices, as pertains to the general principle involved, it was said:

It is settled that the power of the State to classify for purposes of taxation is of wide range and flexibility; but that, while the difference upon which the classification is based need not be great, mere difference is not enough. Classification, to be legitimate, must rest upon some ground of difference having a reasonable and just relation to the object of the legislation. All persons similarly circumstanced must be treated alike. Louisville Gas & E. Co. vs. Coleman, 277 U. S. 32, 37; 72 Law ed. 770, 48 S. Ct. 423, and cases cited.''

In the majority opinion, MR. JUSTICE ROBERTS said that the appellants had produced evidence to prove that there are many points of difference between chain stores and independently operated units, which justified the classification made by the Indiana Act, naming them. That these differences exist in Florida at least in so far as appellant's businesses are concerned, is denied by the bill in this case. Indeed, the existence of these differences in Indiana was doubted by the minority members of the Court. In commenting on this feature of the majority opinion, the dissenting opinion says:

"In the state of Indiana there are approximately 44,-000 retail stores engaged in the same general lines of business, only eight per cent. of which are so-called 'chain stores.' Among them are single stores each of greater value than all the stores of appellee combined, and each doing a business in excess of all that done by appellee. For example, there are two large department stores in the city of Indianapolis, each doing a business of more than $8,000,000. per annum, one operating 124 separate departments and the other 86 separate departments, but each pays a license fee under the statute of only $3.00 per annum; while appellee, owning 225 separate stores and doing a total business of approximately

$1,000,000. per annum, pays license fees of $5,443. per annum—eighteen hundred times as much! Each of several owners of a large number of stores, (145 in one instance) who happens to have only one store in Indiana, pay a license fee of $3., contrasted with the payment of $25. for each store over twenty owned by appellee. Appellee, upon 205 of his stores, pays the aggregate sum of $5,125.; while the proprietors of 205 stores, held and operated separately, pay in the aggregate only $615., although they or some of them may be of equal of greater value, equally well or better located, doing as much or more business, and producing as much or more income. The evidence further shows that a ''co-operative volunteer chain'' consisting of several hundred stores in Indiana paying an annual license fee of only $3. each, operates under an association called the Independent Grocer's Alliance. The association carries on co-operative buying and advertising for the benefit of the members of the group; and it seems clear that as to most, if not all, of the advantages said to be enjoyed by the chain stores the volunteer co-operative group occupies a position of equality.

''These are obvious and flagrant discriminations which put upon the act the clear stamp of unconstitutionality, unless the differences relied upon are gemane to, and reasonably sufficient in substance to sustain, the proposed imposition of license fees of such unequal amounts upon different persons following identical occupations.

''What, then, are the differences, or so-called advantages, relied upon to justify the classification? They were, in their strongest aspect, stated by an expert witness called by the appellants in support of the act, as follows: The ability of the chain stores to make large quantity purchases; to pay cash and thus obtain the advantage of discounts; skill in buying so as to avoid either overstocking or understocking; warehousing in, and distribution from, a single warehouse for numerous stores; large capital with the advantages flowing therefrom; certain pricing and sales policies resulting in slightly lower prices on the part of the chain stores as compared with single stores; more rapid turn-over of goods; cheaper and better advertising; superior management;

standardization in the matter of display; standardization of store management; and similar elements thought to have a beneficial effect upon the disposition of goods.

"But the effect of this enumeration of supposed advantages is completely swept away by the testimony of the same witness on cross-examination, which stands upon the record without dispute, that they are not confined to the chain stores, but are enjoyed as well by such of the favored taxpayers as are engaged in large business, whether in a single establishment or in many establishments.

"Every advantage that I have spoken of as relating to the chain group is that which inheres, primarily, in volume and management without respect to whether it is involved in a chain group or in a single store. Good management makes for volume and volume makes for the possibility of making or acquiring more capital, and more capital makes for the possibility of employing the highest grade of experts, so that there is constant intercommunication of revolving. I would find the same advantage adhering in a large department store over a small one. Every quality that I have enumerated as going to the manner of organization relates itself, primarily, to there being a sufficient capital structure and volume of business to permit it to be carried on, and I would add management in that it is an essential part of it.

\* \* \* \* \* \* \* \* \* \* \*

'Q. So that it does not relate itself to the form of organization——whether they are administering fifty of a hundred stores, or administering one store?

A. No, no.

Q. The fact that it is administering multipley owned stores has nothing to do with it, but it is the fact that it is administering a large business that develops the situation that you have referred to?

A. That is true. But I might add that the management of a large number of stores may contribute to the more rapid increases in the size.

Q. Just as the manager of a large unit store, with many departments, may develop the ability to strengthen and enlarge those departments?

A. Yes.

Q. And the problem would be identical, wouldn't it, in the case of Macy or Gimbel—or, taking it locally in connection with Ayres, or Block?

A. Yes, I would say the problem would be the same. There is no difference in the functions that are performed here—the function of retailing.'

"It thus appears that the advantages attributed to the chain store lie not in the fact that it is one of a *number* of stores under the same management, supervision or ownership, but in the fact that it is one of the parts of a *large business*. In other words, the advantages relied upon arise from the aggregate size of the entire business, and not from the number of parts into which it is divided. For the want of a valid ground upon which to stand, therefore, the classification should fall, because it is made to depend not upon size or value or character, amount of capital invested or income received, but upon the mere circumstance—wholly irrelevant so far as any of the advantages claimed are concerned— that the business of one is carried on under many roofs, and that of the other under one only. Reduced to this single detail of difference, what fairly conceivable reason is there in the policies or objects of *taxation* which gives countenance to the requirement that the former shall make an annual contribution to the revenues of the state eighteen hundred times as much as the latter? A classification comparable in principle would be to make the amount of an income tax depend upon the number of sources from which the income is derived, without regard to the character of the sources or the amount of the income itself.

"Since the supposed differences thus are reduced to the one of number only, and, since that turns out to be irrelevant and wholly without substance, it follows that the act is a "clear and hostile discrimination." against a selected body of taxpayers, Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 237, 33 L. ed. 892, 895, 10 S. Ct. 533—a mere subterfuge by which the members of one group of tax payers are unequally burdened for the benefit of the members of other groups similarly circumstanced. All of which is to say that the legislature

has misapplied its powers to classify with the result of reaching an end forbidden by the 14th Amendment.

"To this situation the language of Mr. JUSTICE FIELD in Santa Clara County v. Southern P. R. Co. (C. C.) 9 Sawy. 165, 18 Fed. 385, 399, seems peculiarly applicable.

'Unequal taxation, so far as it can be prevented, is, therefore, with other unequal burdens, prohibited by the Amendment. There undoubtedly are, and always will be, more or less inequalities in the operation of all general legislation arising from the different conditions of persons from their means, business, or position in life, against which no foresight can guard. But this is a very different thing, both in purpose and effect, from a carefully devised scheme to produce such inequality; or a scheme, if not so devised, necessarily producing that result. Absolute equality may not be attainable, but gross and designed departures from it will necessarily bring the legislation authorizing it within the prohibition. The Amendment is aimed against the perpetration of injustice, and the exercise of arbitrary power to that end. The position that unequal taxation is not within the scope of its prohibitory clause would give to it a singular meaning. It is a matter of history that unequal and discriminating taxation, leveled against special classes, has been the fruitful means of oppressions, and the cause of more commotions and disturbance in society, of insurrections and revolutions, than any other cause in the world.'

"It seems plain enough that we have in the present case 'a carefully devised scheme to produce such inequality; or a scheme, if not so devised, necessarily producing that result.' "

There are certain distinctions between the act here under review and the Indiana act, considered in the above cited case. The Indiana act appears to have applied to all stores, whether wholesale or retail, while the Florida act applies only to retail stores, the stocks carried therein, and held in storage to be sold in or through such stores. There is a difference also in the amount of license fees. Under

the Indiana act, the license fees run from $3.00 for a single store to a maximum of $25.00 for each store in excess of twenty stores when owned and operated under a single ownership whereas under the act here in question the fees run from $5.00 to $50.00. But the most marked difference between the two acts is that the Florida act provides a considerably higher license fee for the same number of stores (in excess of one store) under a single ownership where any of such stores are located in more than one county.

The North Carolina act, which was also upheld by the Federal Supreme Court by a memorandum decision, on October 26, 1931 (Great Atlantic & Pacific Tea Co. vs. Maxwell) did not embrace an ascending graduated scale of fees, but merely provided for a license tax of $50.00 on each store in excess of one store where such two or more stores were under the same management, supervision or ownership.

The motion to dismiss the amended bill in this case, like a demurrer, admits all facts well pleaded in the amended bill. Taking these facts as true, as we must in reviewing the action of the lower court on the motion to dismiss, my conclusion is that the court below erred in granting such motion and in denying the temporary restraining order. For under the principles heretofore enunciated by this court, and by the Supreme Court of the United States, including the recent case of State Board of Tax Commissioners v. Jackson, supra, said Chapter 15624 would be unconstitutional as applied to these appellants, if the facts alleged in the amended bill are true, on the ground that as applied to appellants the act constitutes an arbitrary and unreasonable classification for taxation purposes, contrary to the due process and equal protection clauses of the Federal Constitution and similar provisions in the preamble and sections 1, 4 and 12 of the Declaration of Rights

in our State Constitution. It is my opinion that the facts alleged in the amended bill are sufficient to require the defendants to answer, and that the motion to dismiss was erroneously granted.

It would also appear that those provisions of the act which require increased or higher license fees on multiple stores under the same general management, supervision or ownership, where the same are located in more than one county, are so arbitrary and unreasonable on their face as to render them unconstitutional and to require that they be regarded as eliminated from the act. We cannot see where they have any just or reasonable relation to the object of the act. Under these provisions for instance, a man owning the same number of stores as another man would have to pay a much higher tax per store if he had one of them in an adjoining county, regardless of value or volume of business. This is also contrary to that geographical uniformity which is referred to in Sheip Co. vs. Amos, supra. We cannot see wherein county lines are material in a *State* license statute of this nature. Any given number of stores located in a populous county might do a much larger business than the same number scattered throughout a number of small counties, sparsely populated. Under this act the owner of the 37 Whiddon Stores in Duval County, referred to in the bill, would have to pay total license fees amounting to $510.00, or $13.78 per store. If he decided to locate one store at Fernandina, the addition of this one store would make him liable under the act to license fees on 38 stores totaling $755.00, or $19.60 per store. Thus by establishing one store across the county line his license taxes would be increased $245.00, or nearly 50%. His 37 stores in Jacksonville would remain exactly as before, yet the tax on them would be increased nearly 50% merely because one store was opened in an adjoining county. Such artificial and law-made disparagement of the rights of one citizen and tax payer in favor of another certainly does not

comport with our constitutional guarantees of "equal civil rights" and "equal protection of the laws." Such an arbitrary classification in a state license tax based on mere county lines, is "classification gone wild."

"The citizen's right to pursue any lawful business is property that cannot be taken from him without due process of law, and is one of the privileges of a citizen of the United States of which he cannot be deprived without invading his liberty. The legislature may not, under the guise of protecting public interests, arbitrarily interfere with private business nor impose unusual and unnecessary restrictions on lawful occupations." This was the holding in State v. Rose, 97 Fla. 710, 122 So. 225. In the opinion by Mr. JUSTICE ELLIS in the Rose case, the case of Marymont v. Nevada Banking Board, 111 Pac. 292, 32 L. R. A. (N.S.) 477, was cited, in which case the court said that "The right to do a grocery or dry goods business is available to all citizens and no grant from the sovereign is essential to its existence." Some others of our Florida cases dealing with the subject of the equal protection of the laws, or as our Declaration of Rights expresses it, "all men are equal before the law," are: State v. Bryan, 87 Fla., 57, 99 So. 327; Stewart v. Stearns & Culver Lumber Co., 56 Fla. 570, 48 So., 19, 24 L. R. A. (N.S.) 649; Harper v. Galloway, 58 Fla. 255, 51 So. 236, 26 L. R. A. (N.S.) 794, 19 Anno. Cases 235; S. A. L. R. Co. v. Simon, 56 Fla. 545, 557, 47 So. 1005; Ex parte Messer, 87 Fla. 92, 99 So. 330; Ex parte Smith, 128 So. 864; Teuton v. Thomas, 129 So. 330; Motes v. Hagan, 132 So. 676, L. & N. R. Co. vs. Amos, 98 Fla. 350, 123 So. 745; State ex rel. Davis v. City of Stuart, 97 Fla. 69, 120 So. 335.

There is very little, if any, conflict, in the statement of the general principles which must be observed in order for legislative classifications to square with the constitution, between the majority and minority opinions of the Federal Supreme Court in the Jackson case, above quoted

from. The minority opinion in effect supplements the statement of the doctrine enunciated in the majority opinion by adding thereto a qualification which has long been recognized by this court, as a reading of the cases cited in the preceding paragraph will show, i.e., that such classification should not be merely arbitrary, but the differences on which it is based must have some just and reasonable relation to the subject or object of the legislation and the attempted classification. See the text of the able opinion of Mr. JUSTICE WHITFIELD in the Simon case, supra., 56 Fla. 554, to 557, 47 So., 1002 to 1005. So, in order to get a complete view of the law on this subject, both the majority and minority opinion in the Jackson case must be considered. The chief difference between the two opinions lies in the analysis of the facts and the application of the law to the facts. The writer is further inclined to the view that under our former decisions, as applied to the state of facts alleged in the bill, the act here in question creates such an arbitrary classification as to render it unconstitutional and void.

I am, however, inclined to concur in the conclusion reached by the learned Circuit Judge that the statute here under review was lawfully enacted, in so far as the same was attacked by the bill on the ground that the subject dealt with by it was not within the Governor's call. It is not contended that the act, as finally adopted, was not adopted by a "two-thirds vote of each house," as required by section 8 of Art. IV of the Constitution. The contention is that certain amendments and the motion of concurrence in the House were not adopted by a two-thirds vote.

My view is that the order of the court below dismissing the amended bill and denying the application for temporary injunction should be reversed, and the cause remanded for further appropriate proceedings.

ELLIS, J., concurs.